## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| U.S. CLAIMS, INC., | : | |
| Plaintiff. | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 04-685 |
| | : | |
| YEHUDA SMOLAR, PC d/b/a, | : | |
| SMOLAR, SAKAS & GOODHART | : | |
| Defendant. | : | |

## MEMORANDUM AND ORDER

**Brody, J.**                                                        **March__9th_, 2009**

### I.      Introduction

Plaintiff and Defendant entered into a settlement agreement following litigation over an alleged breach of contract.  Plaintiff now brings an enforcement action alleging that Defendant has breached the settlement agreement.  I find as a matter of law that the Defendant has breached the settlement agreement and has failed to raise any viable defenses to his non-performance.  I therefore grant Plaintiff's motion for summary judgment and enter judgment in an amount to be determined following an evidentiary hearing on damages.

### II.     Background

Plaintiff, U.S. Claims, Inc. ("USC"), is a Delaware corporation engaged in the business of purchasing fee interests in pending litigation claims from attorneys.  Defendant, Yehuda Smolar,

Esq. ("Smolar"), is an attorney licensed to practice in Georgia.  On April 28, 2003 and July 7, 2003, respectively, Smolar and USC entered into purchase agreements (the "Purchase Agreements") pursuant to which Smolar conveyed to USC an interest in his anticipated contingent attorney's fees in specific personal injury cases (the "Fees"), in exchange for a monetary advance from USC.  (Pl.'s Mot. for Summ. J. Exs. A, B [hereinafter "Purchase Agr'm"].); (Levine Dep. 13-24, Aug. 26, 2008.)  The agreements are identical in all material respects, except that Smolar received $75,000 of the total amount of claims sold to USC upon execution of the April 28, 2003 agreement, and $25,000 upon execution of the July 7, 2003 agreement, and the specific cases in which USC purchased a fee interest are different.[1]  The cases in which USC purchased fees (the "Named Claims") are enumerated in a "Schedule of Claimants and Defendants" appended to the Purchase Agreements (the "Schedule").[2]  (Purchase Agr'm 7.)

The Purchase Agreements entitle USC to one hundred percent (100%) of the Fees from the Named Claims, until USC has recouped the amount originally advanced to Smolar, plus interest.  (*Id.* at 1.)  The interest is not calculated by a percentage, but is set forth in a timetable

---

[1]Because the agreements are virtually identical, for ease of reference, all page references to the Purchase Agreements refer to the Purchase Agreement dated April 28, 2003, unless otherwise indicated.

[2]Pursuant to the April 28, 2003 Purchase Agreement, USC purchased an interest in the fees from *Hightower & Hightower v. Ivey*, *LaJuanda Leath v. Honda Motor Company*, and *George & George v. Millis Transfer, Inc.*.  In connection with the July 7, 2003 Purchase Agreement, Smolar sold to USC an interest in the fees from *Wayne Kirland v. Freightliner*, *Rivas v. National Freight, Raven Lawson v. Dekalb Medical Center*, *Lidia Amador v. Mitsuibishi Motors*, and *Marjane Totondi v. Ford Motor Company*.

whereby the amount to be paid to USC increases based on the date payment is made.[3]   (*Id.* at 7.)

If any of Smolar's clients hires new counsel, or if any Named Claim fails to generate proceeds,

either as a result of an adverse verdict or termination of the case, Smolar must transfer to USC

"makeup fees" from other claims in an amount "at least equal" to the estimated Fee for those

Named Claims for which no fee was payable.  (*Id.* at 4.)  The Purchase Agreements specifically

prohibit Smolar from selling or transferring any of USC's interest in the Fees they have

purchased.  (*Id.* at 3.)

On January 29, 2004, USC filed suit against Smolar and Yehuda Smolar, P.C. d/b/a

Smolar, Sackas & Goodheart ("Smolar P.C." and hereinafter, together with Smolar, "Smolar") in

the Court of Common Pleas of Philadelphia County alleging breach of the Purchase Agreements

for non-payment.  Smolar removed the case to federal court in Febuary 2004.  Subsequently, the

parties settled their dispute, and on or about May 5, 2004, executed a written settlement

agreement (the "Settlement Agreement") (Doc #11).

The Settlement Agreement required Smolar to make certain immediate payments to

USC,[4] as well as to:

---

[3]On June 25, 2003 and November 11, 2003, USC and Smolar amended the Schedules to both Purchase Agreements to increase the values of the particular interests that Smolar sold and assigned to USC.  (Pl.'s Mot. for Summ. J. Exs. C, D.)  The amendments do not otherwise effect the terms of the Purchase Agreements.

[4]Smolar agreed to pay $35,955.00 on or before April 30, 2004, "representing payment of USC's portion of the attorney's fees on the *George* and *Rivas* matters," and $28,000.00 on or before May 31, 2004, "representing a payment toward Smolar's obligations under the Purchase Agreements."  (Settlement Agr'm ¶ 4.)

> "continue to be obligated to make payments to USC, pursuant to the terms of the Purchase Agreements, and [to] remit 100% of all attorney's fees received from each remaining [Named] Claim until USC's Interest is paid in full."[5]

(Pl.'s Mot. for Summ. J. Ex. E ¶¶ 4-5 [hereinafter "Settlement Agr'm"].)  The parties also agreed that, except as specifically modified by the terms of the Settlement Agreement, the Purchase Agreements would

> "remain in full force and effect, and all non-modified terms, conditions and warranties shall remain in place."

(Settlement Agr'm ¶ 9.)  Because the terms of the Settlement Agreement require the parties to continue to perform under the Purchase Agreements, reference to the Purchase Agreements is required to understand the parties' obligations under the Settlement Agreement.  On August 27, 2004, this Court entered an order incorporating the Settlement Agreement as an order of the court, and dismissed the case with prejudice (Doc. #10).

In the fall of 2004, Smolar again sought to borrow funds to finance the cases he was handling.  (Def.'s Mem. in Opp. to Pl.'s Mot. for Summ. J. 7 [hereinafter "Def. Mem."].)  USC did not enter into another agreement with Smolar.  However, through Brian Spira, a former broker at USC, now associated with Oxbridge Group LLC, Smolar was introduced to Stillwater Asset Backed Fund, LP ("Stillwater"), a Delaware limited partnership.  (Levine Dep. 64:7-11; Smolar Dep. 122:14-123:18, July 8, 2008.)  On November 9, 2004, Smolar entered into written agreements with Stillwater for a term loan in the amount of $500,000.00 and revolving loans for a principal amount not to exceed $1,500,000.00 (the "Smolar-Stillwater Loan Agreement").  As

---

[5]Smolar agreed to provide USC with a monthly report of the status of each Named Claim that remained unresolved.  (Settlement Agr'm ¶ 6.)

he had done for the Smolar's agreements with USC while employed by USC, Brian Spira acted as Smolar's primary point person for the transactions between Smolar and Stillwater. (Smolar Dep. 81:10-82:6; 119:18-23.) The Smolar-Stillwater Loan Agreement entitles Stillwater to place a lien upon "all personal property and fixtures and interests" of Smolar. (Def. Mem. Ex. E1 121-23.) In "late 2004" Stillwater perfected its lien on Smolar's assets by filing a UCC Financing Statement against Smolar in Fulton County, Georgia, where Smolar practices. (Def. Mem. 8.)

About two years later, in August 2006, Smolar settled the matter of *Hightower & Hightower v. Ivey*, one of the cases identified in connection with the April 28, 2003 Purchase Agreement with USC. (Smolar Dep. 72:2-17.) Believing Stillwater's lien had priority under the Smolar-Stillwater Loan Agreement, Smolar paid the fees associated with *Hightower* to Stillwater. (Smolar Dep. 76:11-17; 114:16-18.) Believing it had a right to those fees pursuant to the Settlement Agreement, USC filed in this court a Motion to Enforce the Settlement Agreement (the "Motion to Enforce") (Doc. #11).[6] On March 6, 2007, USC filed a UCC Financing Statement against Smolar covering their interest in the Fees. (Def. Mem. Ex. F.) On March 8, 2007, USC filed a second lawsuit in this Court against Yehuda Smolar and Smolar P.C., and also named Stillwater, the Oxbridge Group, LLC, and Brian Spira as defendants (the "Second Action"). On June 29, 2007, after hearing oral argument, I re-opened[7] the instant matter and consolidated it with the Second Action. The Second Action was subsequently dismissed for lack

---

[6]A settlement agreement "is enforceable by motion; a party with a grievance need not file a new complaint." *Hobbs & Co., Inc. v. American Investors Mgmt.*, 576 F.2d 29, 34-35 (3d Cir. 1978).

[7]Plaintiff's Motion to Enforce had been denied without prejudice on May 31, 2007 (Doc. #33), effectively ending the case.

of jurisdiction (Doc. #37).[8]  The instant matter remained.  On August 8, 2008, USC moved for summary judgment on the pending enforcement action (Doc. #48).

## III.    Jurisdiction

Smolar initially removed this case to federal court based on diversity jurisdiction.  A court may retain jurisdiction over enforcement of a settlement agreement by incorporating the terms of the agreement into the order of dismissal.  *See Kokkonen v. Guardian Life Ins. Co. of Amer.*, 511 U.S. 375, 380-81 (1994); *Halderman v. Pennhurst State Sch. and Hosp.*, 901 F.2d 311, 317 (3d Cir. 1990) (finding that district court had jurisdiction to enforce settlement agreement where the order of dismissal incorporated the terms of the agreement).  Because the order of dismissal in this action incorporates the terms of the Settlement Agreement, this Court has jurisdiction over the instant enforcement action.

## IV.    Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Kornegay v. Cottingham*, 120 F.3d 392, 395 (3d Cir. 1997).  A factual dispute is "genuine" if the evidence would permit a reasonable jury to find for the non-moving party.  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  The party moving for summary judgment bears the initial burden of demonstrating that there are no facts supporting the nonmoving party's legal position.  *Celotex*

---

[8]USC re-filed the Second Action in the Court of Common Please of Philadelphia County, October Term, 2007, No. 02094 (the "Philadelphia Action").  On August 12, 2008, I denied Smolar's motion to stay the instant matter until resolution of the Philadelphia Action (Doc. #49).

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party carries this initial burden, the

nonmoving party must set forth specific facts showing that there is a genuine issue for trial.  Fed.

R. Civ. P. 56(e); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574,

587 (1986).  The non-moving party "cannot rely merely upon bare assertions, conclusory

allegations or suspicions to support its claim."  *Fireman's Ins. Co. v. DeFresne*, 676 F.2d 965,

969 (3d Cir. 1982).  Rather, the party opposing summary judgment must go beyond the pleadings

and present evidence, through affidavits, depositions, or admissions on file, to show that there is

a genuine issue for trial.  *Celotex*, 477 U.S. at 324.   The court must draw all reasonable

inferences in the non-moving party's favor.  *Matsushita*, 475 U.S. at 587.

## V.     Discussion

A settlement agreement is a contract.  *Tedesco Mfg Co., Inc. v. Honeywell Intern., Inc.*,

127 Fed. Appx. 50, 52 (3d Cir. 2005); *In re Columbia Gas System Inc.*, 50 F.3d 233, 241 (3d Cir.

1995)("Interpreting a Settlement Agreement presents a question of contract law.").  Smolar does

not dispute that the Settlement Agreement is a valid agreement (Def. Mem. 10), and there is no

issue of fact with respect to the existence of a contract.  USC claims that Smolar has breached the

Settlement Agreement by (1) assigning USC's interest in the Fees to Stillwater, (2) failing to

remit attorney's fees from the Named Claims to USC when received, and (3) failing to assign

makeup fees to USC.  In defense of the alleged breach, Smolar argues that USC gave its blessing

to the Smolar-Stillwater Loan Agreement and, therefore, USC is estopped from alleging that

Smolar has breached his obligations to USC in connection with the Smolar-Stillwater Loan

Agreement.  Smolar also asserts that Stillwater's perfecting of its lien ahead of USC has made

performance under the Purchase Agreements impossible.  Upon review of the record before me, I

find that Smolar has breached the Settlement Agreement on both counts.  However, in assessing

damages, I find that there is a genuine issue of material fact as to what portion of Smolar's

attorney's fees the parties intended USC to receive.

A. Breach of the Non-Assignment Clause

Pursuant to the Settlement Agreement, the Purchase Agreements remain in full force and

effect and Smolar is specifically obligated to repay USC "in accordance with the terms,

conditions, and other provisions of the Purchase Agreements."  (Settlement Agr'm ¶¶ 3,9;

Smolar Dep. 70:18-23.)  Therefore, Smolar's obligations under the Settlement Agreement

include the performance of Smolar's obligations under the Purchase Agreements.  USC claims

that Smolar has breached the Settlement Agreement by assigning interests in the Named Claims

to Stillwater, in violation of the Purchase Agreements.  (Pl.'s Mot. for Summ. J. at 3.)

The Purchase Agreements each contain a representation and warranty that:

> You [Smolar] have good and marketable title to the Fees and You have not, prior
> to the date hereof, sold, transferred, assigned and/or conveyed any interest in the
> Fees to any other person or entity, and *You will not do so in the future*.  You
> understand that any violation of this representation will result in an act of fraud by
> You which could result in You being held liable for damages in favor of Us
> [USC], with money to be paid by You to Us. (emphasis added).

(Purchase Agr'm 2.)  In addition, the Purchase Agreements provide:

> You [Smolar] shall not, and will not allow any other party...to take funds away
> from the Interest and/or the Fees...You hereby give up any further rights to sell
> any rights in the Interest and/or the Fees...You will not do anything or allow
> anyone else to do anything that could in any way hurt or lessen Our [USC's] rights
> under this Agreement.

(*Id.* at 3.)

8

Under Delaware law, non-assignment provisions have typically been upheld.[9]   *Paul v. Chromalytics Corp.*, 343 A.2d 622, 625 (Del. Super. 1975).  Furthermore, neither party argues that the non-assignment provision is ambiguous, or is fairly susceptible of different interpretations, and I find that it is not.  When a contract is clear and unequivocal, a party will be bound by its plain meaning.  *Lorillard Tobacco Co. v. American Legacy Foundation*, 903 A.2d 728, 739 (Del. 2006).  The plain meaning of these provisions is that Smolar is not permitted to contract away USC's interest in the Fees from the Named Claims to another entity.

The Smolar-Stillwater Loan Agreement gives Stillwater the right to place a lien upon "all personal property and fixtures and interests" of Smolar, including Smolar's "Accounts," which are defined as: "all present and future rights of the Borrower [Smolar] to payment of a monetary obligation, whether or not earned by performance, which is not evidenced by chattel paper or an instrument, (i) for services rendered or to be rendered, or (ii) for a secondary obligation incurred or to be incurred."  (Def. Mem. Ex. E1 121.)  This definition encompasses Smolar's future contingent attorney's fees.  *See e.g., PNC Bank v. Berg*, No. 94C-09-208-WTQ, 1997 WL

---

[9]The Settlement Agreement specifies that Delaware law shall govern the interpretation of the agreement.  (Settlement Agr'm ¶ 12.**)**  The Purchase Agreements also provide that they shall be governed by the laws of Delaware.  (Purchase Agr'm 5.)   Federal courts sitting in diversity must apply the choice of law principles of the forum state, in this case Pennsylvania.  *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Kruzits v. Okuma Mach. Tool, Inc.*, 40 F.3d 52, 55 (3d Cir. 1994).  Under Pennsylvania law, "choice of law provisions of a contract will be given effect." *Miller v. Allstate Ins. Co.*, 763 A.2d 401, 403 (Pa. Super. 2000); *T&N PLC v. Penn. Ins. Guar. Ass'n*, No. 90-4946, 1992 WL 125554 at *6 n. 4 (E.D. Pa. May 29, 1992) (honoring choice of law provision in settlement agreement where the parties had sufficient ties to the chosen state). *See also* Restatement (Second) of Conflict of Laws § 187 (1971).  I therefore apply Delaware law in analyzing the parties' claims.  The elements of a claim for breach of contract under Delaware law are (1) a valid contract exists, (2) breach of a duty imposed by the contract, and (3) damages. *VLIW Technology, LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

527978, at *9 (Del. Super. Ct. Jan. 31, 1997) (holding that a law firm's unmatured contingency fee contracts were "contract rights" which fell within the definition of "account" under the Uniform Commercial Code, which is defined as "any right to payment for goods sold or for services rendered...whether or not it has been earned by performance.").  The Smolar-Stillwater Loan Agreement further provides that the security interests granted to Stillwater take priority over all other liens and security interests, except as disclosed on Schedule 4.12.  (Def. Mem. Ex. E2 at 15.)  Schedule 4.12 carves out from Stillwater's interest in Smolar's assets liens held by the IRS, Georgia Department of Revenue, The Peachtree Bank, Settlement Capital Corporation, and Themis Corporation.  Schedule 4.12 does not carve out from Stillwater's reach the monies owed to USC under the Settlement Agreement between USC and Smolar, or the Purchase Agreements. Thus, by entering into the Smolar-Stillwater Loan Agreeement, Smolar effectively conveyed or assigned USC's interest in the proceeds from the Named Claims to Stillwater, in breach of his covenants under the Purchase Agreements.

    1.    <u>Defendant's Equitable Estoppel Defense</u>

Smolar does not deny that it paid fees collected from the Named Cases to Stillwater instead of USC.  (Smolar Dep. 72:2-76:19; 77:8-78:17.)  Instead, Smolar asserts an estoppel defense, arguing that he cannot be held not liable for breach of contract because USC was "fully aware of the transactions entered into between Stillwater and Smolar and consented to those transactions." (Def. Mem. 11).  To prevail on his estoppel defense, Smolar must establish that (1) the party to be estopped must have known the facts; (2) the party to be estopped must intend that his conduct will be acted upon or must so act that the party asserting the estoppel has the right to believe it was so intended; (3) the party asserting estoppel must be ignorant of the true facts; and

(4) the party asserting estoppel must rely on the other party's conduct to his injury.  *IRS v. Kaplan*, 104 F. 3d 589, 601 (3d Cir. 1997).  In other words, Smolar must show that USC consented to the transaction with Stillwater and intended for Smolar to enter into the transaction based on that consent, and that Smolar was ignorant of the true facts related to the transaction and relied on USC's consent to his injury.

Smolar's evidence that USC consented to the Smolar-Stillwater Loan Agreement is his "impression" that the deal with Stillwater was being done with USC's "blessing" because the additional loan from Stillwater would "allow [Smolar] to continue to function so that [he] could finish the cases to pay them to [USC]."  (Smolar Dep. 130:7-14.)  Smolar's impression is not based on direct communications with USC, but on communications with Brian Spira, the broker for the transaction.  Smolar claims that because Spira previously worked for USC, he "knew exactly what the deal [with USC] was" and that what was "on the table at all times was that U.S. Claims is owed this amount of money." (Smolar Dep. 130:2-7.)  This limited basis is insufficient to find USC's compliance with the terms of the Stillwater deal.  (Id.)  Other than Smolar's impression, and his "understanding...that U.S. Claims' interest was going to be honored," there is no evidence that USC consented to Smolar's transaction with Stillwater.[10]  (Smolar Dep. 130:22-25.)  In fact, the evidence submitted is that in the later half of 2004, Brian Spira, on behalf of Smolar, asked USC if it would take a subordinate position to Stillwater with respect to Smolar's attorney's fees, and USC said "no."  (Levine Dep. 65:3-14.)  Thus, the evidence submitted demonstrates that USC's consent, if any, would have been contingent on their interest in the

_____

[10]The deposition of Brian Spira was not submitted to the record.

Named Cases being superior to Stillwater's.  But even assuming that USC had given its "blessing" to a transaction between Stillwater and Smolar on that basis, and that Smolar justifiably relied on that consent in entering the Smolar-Stillwater Loan Agreement, Smolar has failed to show that he "lacked knowledge or the means of obtaining knowledge of the truth of the facts in question" - namely, that USC's interests were not, in fact, superior to Stillwater's under the Smolar-Stillwater Loan Agreement.  *Burge v. Fidelity Bond and Mortg. Co.*, 648 A.2d 414, 420 (Del. 1994).

Smolar was in a position to determine the standing of his obligations to USC under the terms of the Smolar-Stillwater Loan Agreement before entering into that agreement.  Smolar testified that it "never occurred to [him] that USC had not followed commercially standard procedures by failing to file UCC financing statements."  (Def. Mem. 9.)  However, Smolar was aware of his obligations under the Purchase Agreements not to sell or assign USC's interest in the Named Claims (Smolar Dep. 136:2-20), and there is evidence that Smolar was concerned about the priority of USC's claims under the Smolar-Stillwater Loan Agreement well before any UCC financing statement was filed (Smolar Dep. 130:20-131:16).  However, there is no evidence that Smolar contacted or attempted to contact USC before entering into the Smolar-Stillwater Loan Agreement to obtain clarity on these issues.[11]  (Smolar Dep. 158:15-20.)  Smolar's performance is not excused by acting on his mere "understanding" that USC's claims would be honored.  (Smolar Dep. 130:15-25.)  Smolar was in a position to find out exactly what effect the

---

[11]That Brian Spira allegedly made representations to Smolar about the status of USC's claims under the Smolar-Stillwater Loan Agreement is irrelevant.  Brian Spira did not represent USC in this transaction.

Smolar-Stillwater Loan Agreement would have on the assets he had conveyed to USC pursuant to the Settlement Agreement and the Purchase Agreements and he failed to do so. Smolar's estoppel defense fails as a matter of law.[12]

By assigning to Stillwater rights in all of his assets, including attorney's fees contractually owed to USC under the Purchase Agreements, Smolar breached the non-assignment provisions of those agreements, and thereby violated the terms of the Settlement Agreement. Breach of a non-assignment provision renders the assigning party liable in damages to the non-assigning party. *See Bel-Ray Co., Inc. v. Chemrite Ltd.*, 181 F.3d 435, 442 (3d Cir. 1999).

## B. Breach for Non-Payment

USC also claims that Smolar has breached the Settlement Agreement by failing to remit Fees from the Named Cases when received, and failing to designate makeup fees to replace any purchased interest in cases that were lost or dropped. (Pl's Mot. for Summ. J. 3.) Smolar admits that he failed to remit the Fees from certain Named Claims to USC as required by the Settlement Agreement, and instead paid those proceeds to Stillwater. (Smolar Dep. 72:2-76:19; 77:8-78:17.) However, Smolar contends that when Stillwater perfected its lien on the assets ahead of USC, he was relieved of his obligation to perform under the Settlement Agreement by the doctrine of commercial impossibility.

### 1.     Defendant's Commercial Impossibility Defense

_____

[12]I also find that, to the extent Smolar's estoppel defense is styled as a waiver defense, the defense fails as a matter of law. Any waiver of a non-assignability provision or consent to its violation must be "clear, distinct, and unequivocal." *Paul*, 343 A.2d at 625 (Del. Super. 1975) (citing *Concrete Form Co. v. W. T. Grange Constr. Co.*, 320 Pa. 205, 181 A. 589, 590 (Pa. 1935). The evidence submitted is that USC explicitly declined to waive the non-assignment provision. Smolar cannot defend its actions on the basis of waiver.

Smolar contends that performance of the contract with USC has been rendered impossible, or impractical to perform, because after he entered into the contract with Stillwater - through no fault of his own - Stillwater filed a UCC statement which gave them a priority lien on all of Smolar's assets, including his future attorney's fees.  (Def. Mem. 13.)  Payment of any Fees from the Named Cases to USC is now impossible because Stillwater has priority of payment over USC.

Smolar is correct that because Stillwater perfected its lien on Smolar's assets ahead of USC, USC's interests are legally subordinate to Stillwater's.  *See U.S. Claims, Inc. v. Flomenhaft & Cannata, LLC*, 519 F.Supp.2d 515, 523-24 (E.D. Pa. 2006) (applying the Uniform Commercial Code in holding that the "Article 9 rules on priority are clear: perfected interests prevail over unperfected ones, and the first to perfect wins. . . [Therefore], because USC "did not file the requisite financing statement, its security interest is unperfected and thus is subordinate to defendant Stillwater's perfected conflicting interests").  The facts in *Flomenhaft* are substantially similar to the facts in this case, and in fact, involved some of the same parties.  However, *Flomenhaft* did not address the issue present here, of whether a third party claiming a priority right to payment is grounds to discharge performance of a contract as commercially impossible. Based on the facts of this case, I find that it is not.

The doctrine of commercial frustration allows a party to discharge his or her duty to perform under a contract where "after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made."  Restatement (Second) Contracts § 261

14

(1981) (the "Restatement").[13]  Commercial frustration is a question of law to be determined by

the court.  *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 872 A.2d 611, 620-21 (Del. Ch. 2005)

(reversed in part on other grounds).

 Discharge by reason of impracticality requires proof of three elements: (1) the party

claiming discharge must establish the occurrence of an event the non-occurrence of which was a

basic assumption of the contract; (2) continued performance is not commercially practicable and

the cost of performance has become so unreasonable that failure to excuse performance would

result in grave injustice; and (2) the party claiming discharge did not expressly or impliedly agree

to perform in spite of impracticality that would otherwise justify his nonperformance.  *Freidco of*

*Wilmington, Del., Ltd. v. Farmers Bank of State of Del.*, 529 F.Supp. 822, 825 (D.C. Del. 1981).

The "defense of commercial frustration is very difficult to invoke, as courts have been extremely

reluctant to allow parties to disavow obligations that they have agreed to."  *Wal-Mart*, 872 A.2d

at 620-21; *Freidco*, 529 F. Supp. at 830 ("Discharge or alteration of contractual obligations is an

extraordinary remedy, however, and is not justified absent a showing of the occurrence of an

event which has in fact rendered performance commercially impracticable.").  The commercial

frustration doctrine does not apply "if at the time of contracting the supervening event was

reasonably foreseeable, and could (and should) have been anticipated by the parties and provided

for in the contract."  *Wal-Mart*, 872 A.2d at 621.  Further, "impossibility originating in financial

---

[13]Delaware has adopted the doctrine of commercial impracticality as set forth in section 261 of
the Restatement.  *J & G Assocs. v. Ritz Camera Ctrs., Inc.*, No. 9811, 1989 WL 115216, at *3
(Del. Ch. Oct. 3, 1989); *Freidco of Wilmington, Del., Ltd. v. Farmers Bank of State of Del.*, 529
F.Supp. 822, 825 (D.C. Del. 1981) (noting that Delaware enacted Section 2-615 of the UCC
which served as a model for the Restatement).

incapacity is no excuse."  *Martin v. Star Pub. Co.*, 126 A.2d 238 (Del. 1956); *See also Freidco*,
529 F. Supp. at 827 ("[C]ourts ordinarily do not conclude that an increase in the cost of
performance is an event that non-occurrence of which was a basic assumption of the contract.").

Smolar has not submitted any evidence that a third party asserting a priority right to the
Fees was an event, the non-occurrence of which was a basic assumption of the contract.  In fact,
the possibility of a third party asserting a priority claim over USC's interest in Smolar's fees was
something that the parties clearly anticipated and specifically provided for in both the Settlement
Agreement and the Purchase Agreements.  The Settlement Agreement asserts that Smolar has
"no set-off, defense, or affirmative claim which would in any way defeat or defer the claims of
USC under the Purchase Agreements."  (Settlement Agr'm ¶ 3.)  Smolar represented in the
Purchase Agreements that "Neither Your Fees, nor to Your knowledge, the Claims nor the
Aggregate Proceeds, are subject to any liens...or other rights of third parties" and that to his
knowledge, the "Claimants have not sold, transferred, assigned and/or conveyed any interest in
the Claims or in the proceeds of the Claims to any person or entity."  (Purchase Agr'm 3.)  In
addition, the non-assignment provisions in the Purchase Agreements restrict Smolar's ability to
convey USC's interest to third parties.  The supervening event in this case - a third party having
or obtaining a priority interest in the assets contractually owed to USC - is not only an event that
was reasonably foreseeable, it was a contingency the parties specifically anticipated and
contracted around in their agreements.  Perfecting their lien first may give Stillwater priority of
payment over USC; however, this event does not discharge Smolar's performance under the
Purchase Agreements or Settlement Agreement as commercially impossible.  Smolar has

16

breached the Settlement Agreement by failing to pay attorney's fees to USC, and failing to

provide makeup fees and his performance is not excused by impossibility.

C.  Damages

Having found that Smolar has breached the Settlement Agreement, I must now determine

damages.  *Hobbs & Co., Inc. v. American Investors Mgmt.*, 576 F.2d 29, 33 (3d Cir. 1978) ("[A]

district court generally has jurisdiction to enforce a settlement agreement entered into under its

aegis, and as part of its enforcement powers to award damages for breach of such an

agreement.") (internal citations omitted).  The purpose of remedies for breach of contract is to

permit the aggrieved party to be made whole with compensatory damages payable by the party

breaching the contract.  *See First Nat. State Bank of New Jersey v. Commonwealth Fed. Sav. and

Loan Ass'n*, 610 F.2d 164, 174 (3d Cir. 1979).

Under the terms of the Settlement Agreement, Smolar is obligated to make payments to

USC pursuant to the terms of the Purchase Agreements and remit 100% of all attorney's Fees

received from each of the remaining Named Claims, until USC's interest is paid in full.[14]

(Settlement Agr'm  ¶ 5.)   The Purchase Agreements set forth the amount owed to USC in a

timetable, and provide that if no Fees are received for a Named Claim that makeup fees shall be

designated.  USC contends that because Smolar has not yet paid the required sums, they are owed

the full amount that could possibly be due under the Purchase Agreements, reduced by the

---

[14]The proceeds of the *George* and *Rivas* cases, totaling $63,955 were paid to USC pursuant to the
Settlement Agreement.  (Settlement Agr'm ¶ 4.)  Thus, the remaining Named Claims at the time
USC brought its Motion to Enforce were *Hightower & Hightower v. Ivey*, *LaJuanda Leath v.
Honda Motor Company*, *Wayne Kirland v. Freightliner*, *Raven Lawson v. Dekalb Medical
Center*, *Lidia Amador v. Mitsuibishi Motors*, and *Marjane Totondi v. Ford Motor Company*.

$63,955.00 already paid pursuant to the Settlement Agreement, for a total of $1,745,590.00.[15]

Smolar submits that, pursuant to the Settlement Agreement, Smolar is only required to pay 100%

of the attorney's fees he *received* from each of the Named Claims, until USC's interest is paid in

full. (emphasis added).  The amount of attorney's fees that Smolar has received to date from all

of the cases in which USC took an interest was $711,179.11.[16]  (Def. Mem. Ex. H.)   Therefore,

after deducting the $63,955.00 already paid, Smolar believes he is obligated to USC for no more

than $647,224.11.  (Def. Mem. at 17.)

      Defendant is correct that USC's only interest is in the value of the Named Claims.  There

is nothing in the Settlement Agreement or the Purchase Agreement that permits USC to collect

fees from cases other than the Named Claims (unless designated as makeup fees).  Smolar cannot

be made to pay more than was received in fees from the Named Claims, regardless of the date

payment is made.  There remains, however, a dispute as to whether the Fees to be totaled are

Smolar's own individual attorney's fees, or the total amount of attorney's fees received for each

Named Claim.  USC believes that Smolar breached the Settlement Agreement by paying out a

portion of the Fees to referral attorneys instead of paying the full amount of the Fees awarded in

each case to USC.  Smolar contends that USC knew from the outset that referral attorneys were

---

[15]Smolar's total liability under the Purchase Agreements, if Smolar fails to pay USC on or before October 28, 2006, is $701,723.00 pursuant to the April 28, 2003 Purchase Agreement, as amended June 25, 2003, and $1,109,822.00 pursuant to the July 7, 2003 Purchase Agreement, as amended November 11, 2003, for a sum total of $1,811,545.00.

[16]*Hightower* settled for $500,000.00 and Smolar's individual attorney fee was $60,000.00. (Def. Mem. Ex. H.)  *Leath* settled with some of the defendants for $1,461,446.59; Smolar's fee was $188,00.00.  (Id.)  *Kirkland* settled for $5,420,000.00 of which Smolar received $331,868.00. (Id.)   Smolar's fee from the *Lawson* case, which settled for $200,00.00, was $98,000.00.  (Id.)

entitled to a portion of the Fees and that the term "all attorney's fees" meant only the portion of fees that belonged to Smolar.  (Def. Mem. at 9.)

When parties contest the meaning of a contract provision, the role of the Court is to look to the words used by the parties to determine their intent.  *Lorillard Tobacco Co. v. American Legacy Foundation*, 903 A.2d 728, 739 (Del. 2006).  A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction.  *W.L. Gore & Associates, Inc. v. Wu*, No. A263-N, 2006 WL 2692584, at *15 (Del. Ch. Sept. 15, 2006).  When the language of a contract is clear and unequivocal, a party will be bound by its plain meaning.  *Id.* Contract language is only unclear and ambiguous if, read in the context of the entire agreement, it is susceptible to more than one meaning.  *Bell Atlantic Meridian Sys. v. Octel Commc'ns Corp.*, No. 14348, 1995 WL 707916, at *6 (Del. Ch. Nov. 28, 1995); *Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 395 (Del Super. 1996).  The true test is "not what the parties to the contract intended it to mean, but was a reasonable person in the position of the parties would have thought it meant."  *W.L. Gore & Associates*, 2006 WL 2692584, at *15.

The Settlement Agreement states in the recitals that Smolar and USC entered into Purchase Agreements "in which [Smolar] conveyed to USC a Portion of the *attorney's fees to be earned by [Smolar]* in various personal injury claims." (Settlement Agr'm 1.) (emphasis added).  The Settlement Agreement also provides that Smolar is "obligated to make payments to USC, pursuant to the terms of the Purchase Agreements, and shall remit 100% of *all attorney's fees* received from each remaining [Named] Claim, until USC's interest is paid in full."  (Settlement Agr'm ¶ 5) (emphasis added).  To understand what "attorney's fees" are, the parties must refer to the Purchase Agreements, which are integrated into the Settlement Agreement by reference.

(Settlement Agr'm ¶¶ 5,9.)  The Purchase Agreements define "Fees" as a percentage of the proceeds Smolar receives in connection with the verdict, award or settlement of each of the Named Claims.  (Purchase Agr'm 1.)  The Purchase Agreements further represent that Smolar is to be "the only counsel engaged by Claimants with respect to the [Named] Claims."  (Purchase Agr'm 3.)  If Smolar were the only counsel engaged with respect to the Named Claims, he would be the only attorney entitled to attorney's fees; therefore, entitling USC to "all fees" and simultaneously to all of "Smolar's fees" would have essentially the same meaning - Smolar's entire fee would also be the entire amount of attorney's fees.  In this case the ambiguity arises upon consideration of the contingency fee agreements between Smolar and the Claimants that are appended to the Purchase Agreements (the "Fee Agreements") and form part of the integrated document.[17] (Purchase Agr'm 2.).  Those Fee Agreements clearly indicate that Yehuda Smolar was not the only attorney retained on these matters and that other attorneys were also engaged on behalf of the Claimants and entitled to fees.  (*See* Purchase Agr'm Ex. B.)  In light of the Fee Agreements, the fact that one provision of the Settlement Agreement refers to *Smolar's* attorney's fees and another provision in the same agreement refers to *all* attorney's fees, becomes ambiguous and subject to multiple interpretations: Does "all" mean all of Yehuda Smolar's fees, or all of the attorneys' fees earned for the case, irrespective of any fee sharing arrangements with referral counsel?

---

[17]"The Fee Agreeements, copies of which are attached hereto as 'Exhibit B' were duly and validly authorized, executed and delivered by You and Claimants and constitute the legal, valid and binding obligations of You and Claimants..." (Purchase Agr'm 2.)

Under the parol evidence rule, "where the language of a written integration is susceptible to more than one reasonable interpretation, the court will consider proffered admissible evidence bearing upon the objective circumstances relating to the background of the contract." *Concord Steel, Inc. v. Wilmington Steel Processing Co. Inc.*, No. 3369-VCP, 2008 WL 902406, at *4 (Del. Ch. Apr. 3, 2008); *Cincinnati SMSA Ltd. Partnership v. Cincinnati Bell Cellular Systems Co.*, No. 15388, 1997 WL 525873 (Del. Ch. Aug. 13, 1997) ("If the words of [an] agreement 'can only be known through an appreciation of the context and circumstances in which they were used' a court is not free to disregard extrinsic evidence of what the parties intended.") (citing *Klair v. Reese*, 531 A.2d 219, 233 (Del. Supr. 1987). Such extrinsic evidence may include "overt statements and acts of the parties, the business context, prior dealings between the parties, and business custom and usage in the industry." *Id.* The parties' prior conduct under the agreement is another "important source of evidence to which the court should turn." *Board of Educ. of Appoquinimink Sch. Dist. v. Appoquinimink Educ. Ass'n*, No. 16812, 1999 WL 826492, at *8 (Del. Ch. Oct. 6, 1999).

Because Smolar never paid any fees to USC pursuant to the Purchase Agreements, I cannot look to the parties' past behavior to ascertain whether Smolar paid only his portion of the fee, or the total fee, to the plaintiffs. The deposition testimony of Smolar demonstrated his understanding that "entitlement to fees was not the full amount of the fees that may be recovered in the case because there were other lawyers involved" from the beginning. (Smolar Dep. 81:10-16.) At the same time, Smolar was aware of the provision in the contract guaranteeing that he was the sole attorney for the Named Claims (Smolar Dep. 83:6-85:15.) And while there is evidence that USC reviewed certain "fee agreements" prior to entering into the Purchase

Agreements (Levine Dep. 24:3-18), there is no indication that those documents disclosed any fee sharing arrangements between Smolar and referral counsel.  The limited extrinsic evidence in the record on this issue is insufficient for me to make a determination as to the appropriate measure of damages.  I therefore will order an evidentiary hearing on the issue of whether the parties intended that USC would receive *all* of the attorney's fees received from each of the Named Cases, or only Smolar's individual attorney's fee.  *See Mellon Bank, N.A., v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1011 (3d Cir. 1980) ("It is the role of the judge to consider the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning.  The trial judge must then determine if a full evidentiary hearing is warranted.").

## VI.    Conclusion

USC has presented evidence sufficient to establish every element of his claim for breach of the Settlement Agreement and there is no genuine issue of material fact for trial with respect to the defendant's liability.  Therefore, summary judgment is granted for the plaintiff.  Judgment shall enter in an amount to be determined following an evidentiary hearing on the proper measurement of plaintiff's damages.  An appropriate order follows.

**ORDER**

**AND NOW**, this __9th____ day of March, 2009, upon consideration of Plaintiff's

Motion for Summary Judgment (Doc. #48) and Defendant's response thereto, it is **ORDERED**

that the Motion is **GRANTED**.  Judgment shall enter for Plaintiff in an amount to be determined

after an evidentiary hearing on the issue of damages to be held on April 20, 2009 at 10:00 a.m.,

in Courtroom 7A, on the 7th floor.

s/Anita B. Brody

_____

ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:                    Copies **MAILED** on _____ to:

23